STROUD, Judge.
 

 *257
 
 Respondent-mother appeals from a permanency planning order which established a permanent plan for guardianship for her son J.H. ("James")
 
 [1]
 
 AND APPOINTED HIS MAternal grandparents as guardians. respondent-mother argues that the trial court (1) lacked jurisdiction to enter orders affecting James's custody under the Uniform Child-Custody Jurisdiction and Enforcement Act ("UCCJEA"); (2) erred in relying on written reports that had not been formally tendered and admitted into evidence; (3) failed to verify that James's grandparents understood the legal significance of guardianship and had adequate resources to care for James; (4) erred in concluding that it was impossible to return James to respondent-mother within six months and that further reunification efforts would be futile; (5) erred in concluding that it was in James's best interests for respondent-mother to have minimal visitation and entering a visitation plan that failed to set out the duration of each visitation; and (6) erred in waiving further review hearings. We vacate and remand for further proceedings. We also deny the motion to dismiss by the guardian
 
 ad litem
 
 ("GAL").
 

 I. Background
 

 In April 2013, James was born in North Carolina. From April 2013 to late November 2013, James and respondent-mother lived in North Carolina. Respondent-father
 
 *232
 
 resides in North Carolina. On 22 November 2013, respondent-mother took James with her to Texas. On 13 January 2014, after a physical altercation in Texas with her ex-husband ("Mr. J."), respondent-mother left James with Mr. J. without baby supplies. On or about 29 January 2014, a Texas court ordered that respondent-mother have temporary sole custody of James and that respondent-father have no contact with James because he had not yet established paternity.
 

 On or about 20 February 2014, respondent-mother and James returned to North Carolina. On 7 March 2014, Chatham County Department of Social Services ("DSS") filed a juvenile petition alleging that James was neglected and dependent. DSS alleged that respondent-father had been recently charged with assaulting respondent-mother and that he "was about to hit [James but] Respondent mother [had] intervened." DSS also alleged that respondent-mother had a "long history" of untreated substance abuse as well as a history with Child Protective Services ("CPS") in Alamance County and in Texas. DSS further alleged that respondent-mother "ha[d] moved around in order to avoid CPS involvement" and had said that "she plan[ned] to leave this jurisdiction
 
 *258
 
 and return to Texas." On 7 March 2014, the trial court granted DSS nonsecure custody of James, and DSS placed James with his maternal grandparents, who are custodians of respondent-mother's daughter, who was born in July 2008.
 

 On 22 May 2014, the trial court held a hearing on the petition. On 19 June 2014, the trial court adjudicated James a neglected and dependent juvenile. The trial court found that respondents had a history of domestic violence and noted that on 3 August 2013, Alamance County Department of Social Services had received a report of physical abuse, domestic violence, and improper care of James, which was later substantiated. The trial court further found that respondent-mother "has a fifteen (15) year ongoing history of substance abuse" and "has participated in treatment through [F]reedom House and other treatment facilities." The trial court also found that when a social worker had met with respondent-mother, the social worker had observed the following: "[Respondent-mother had] bruises on her face, arm, back and stomach. She was erratic in her behavior, repeated herself several times and was unable to sit still. She described a history of violence between [her] and Respondent father." The trial court also found that James had been "born positive for barbitu[r]ates" and "was noted to have developmental delays" at the time DSS took him into nonsecure custody on 7 March 2014. Specifically, James "was not able to roll over, crawl, scoot or pull himself up, as is typical for his age."
 

 After holding a custody review hearing on 24 July 2014, the trial court entered a custody review order on 2 September 2014 continuing James's custody with DSS and his kinship placement with his maternal grandparents and denying respondent-mother any visitation with James. After holding a hearing on 8 January 2015, the trial court entered a permanency planning order on 23 February 2015 concluding that further reunification efforts would be futile, establishing a permanent plan of guardianship for James, and appointing his maternal grandparents as his guardians. The trial court awarded respondent-mother "monthly" supervised visitation with James but waived further review hearings and relieved DSS and the GAL "of further responsibility" in the case. The trial court also found: "Since the inception of this case, Respondent mother has resided in Texas but has been back and forth between Texas and North Carolina. She reports that she lives with her ex-husband in Texas." Respondent-mother gave timely notice of appeal from the 23 February 2015 permanency planning order.
 

 *259
 
 II. UCCJEA Jurisdiction
 

 A. Preservation
 

 Respondent-mother contends that the trial court lacked subject matter jurisdiction under the UCCJEA.
 
 See
 
 N.C. Gen. Stat. ch. 50A, art. 2 (2013). Having failed to appeal from the 7 March 2014 order for nonsecure custody, the 19 June 2014 adjudication and disposition order, and the 2 September 2014 custody review order, respondent-mother now argues that the issue of subject matter jurisdiction may be raised at any time and
 
 *233
 
 that lack of such jurisdiction makes void all of the trial court's orders although she "concedes that it is arguable the trial court had the authority to exercise emergency jurisdiction and grant nonsecure custody of James to DSS[.]" The GAL responds that respondent-mother's failure to appeal from the 19 June 2014 adjudication and disposition order bars her from now challenging the trial court's jurisdiction.
 

 "It is axiomatic that a trial court must have subject matter jurisdiction over a case to act in that case."
 
 In re S.D.A., R.G.A., V.P.M., & J.L.M.,
 

 170 N.C.App. 354
 
 , 355,
 
 612 S.E.2d 362
 
 , 363 (2005). "Subject matter jurisdiction cannot be conferred by consent or waiver" by the parties.
 
 In re H.L.A.D.,
 

 184 N.C.App. 381
 
 , 385,
 
 646 S.E.2d 425
 
 , 429 (2007),
 
 aff'd per curiam,
 

 362 N.C. 170
 
 ,
 
 655 S.E.2d 712
 
 (2008). "When a court decides a matter without the court's having jurisdiction, then the whole proceeding is null and void,
 
 i.e.,
 
 as if it had never happened. Thus the trial court's subject-matter jurisdiction may be challenged
 
 at any stage of the proceedings,
 
 even for the first time on appeal."
 
 In re K.U.-S.G., D.L.L.G., & P.T.D.G.,
 

 208 N.C.App. 128
 
 , 131,
 
 702 S.E.2d 103
 
 , 105 (2010) (emphasis added and citation and quotation marks omitted). "When the trial court never obtains subject matter jurisdiction over the case, all of its orders are void
 
 ab initio.
 
 "
 
 In re A.G.M.,
 
 --- N.C.App. ----, ----,
 
 773 S.E.2d 123
 
 , 129 (2015) (quotation marks and brackets omitted). We therefore conclude that respondent-mother's jurisdictional claim is properly before this Court.
 

 B. Standard of Review
 

 The North Carolina Juvenile Code grants our district courts "exclusive, original jurisdiction over any case involving a juvenile who is alleged to be abused, neglected, or dependent." N.C. Gen.Stat. § 7B-200(a) (2011). However, the jurisdictional requirements of the Uniform Child Custody Jurisdiction Enforcement Act ("UCCJEA") and the Parental Kidnapping Prevention Act ("PKPA") must also
 
 *260
 
 be satisfied for a court to have authority to adjudicate petitions filed pursuant to our juvenile code.
 

 In re E.J.,
 

 225 N.C.App. 333
 
 , 336,
 
 738 S.E.2d 204
 
 , 206 (2013). Whether the trial court has jurisdiction under the UCCJEA is a question of law subject to
 
 de novo
 
 review.
 
 See
 

 K.U.-S.G., D.L.L.G., & P.T.D.G.,
 

 208 N.C.App. at 131
 
 ,
 
 702 S.E.2d at 105
 
 .
 

 C. Analysis
 

 We preliminarily note that the juvenile petition, as included in the record on appeal, lacked the information required by N.C. Gen.Stat. §§ 7B-402(b), 50A-209(a) regarding "the places where the child has lived during the last five years" and DSS's knowledge "of any proceeding that could affect the current proceeding[.]"
 
 See
 
 N.C. Gen.Stat. §§ 7B-402(b), 50A-209(a) (2013). Typically, DSS satisfies this statutory obligation by filing an "Affidavit as to Status of Minor Child" form, listing the addresses of the juvenile and his caretakers "during the past five (5) years" and providing "information about a [ny] custody proceeding ... that is pending in a court of this or another state and could affect this proceeding." Form AOC-CV-609 (revised July 2011) (Portion of original in all caps). Here, DSS even alleged: "The information required by G.S. 50A-209 is set out in the Affidavit As To Status Of Minor Child (AOC-CV-609), which is attached hereto and incorporated herein by reference." (Portion of original in bold.) But no such affidavit appears in the record, even though the petition listed respondent-mother's address as a motel in Siler City, North Carolina and included allegations that "Respondent mother has a CPS history in Alamance County and in the state of Texas[,]" that "Child Protective Services in Texas reports that Respondent mother did not comply with service recommendations for ... supervised visitation[,]" and that "Respondent mother has said that she plans to leave this jurisdiction and return to Texas."
 
 [2]
 
 "It was the continuing
 
 *234
 
 duty of DSS to make reasonable efforts to insure that there were no proceedings in another state that could affect the current proceeding."
 
 A.G.M.,
 
 --- N.C.App. at ----,
 
 773 S.E.2d at 128
 
 (quotation marks omitted) (citing N.C. Gen.Stat. § 50A-209(d) (2013) ).
 
 *261
 
 i. Texas Child-Custody Determination
 

 At the initial adjudicatory and dispositional hearing on 22 May 2014, the trial court received into evidence and found credible reports submitted by DSS and the GAL. The trial court attached these reports to its 19 June 2014 adjudication and disposition order and incorporated them by reference into its findings of fact. The GAL's report stated:
 

 On January 13, 2014, [respondent-mother] was publicly intoxicated after a physical altercation with [Mr. J.] She left the home with [James] without baby supplies. [James] was released to [Mr. J.] A Safety Plan was put in place on February 3, 2014, requiring [Mr. J.] to supervise all contact between [James] and his mother.
 

 DSS's "Adjudication Court Report" included the following information about a previous Texas order:
 

 While discussing possible placement options, [respondent-mother] produced a court order from the state of Texas dated 01/29/14 stating that [respondent-father] is to have no contact with the minor child, [James], and that [respondent-mother] has temporary sole custody. The order stated that "the court finds that [respondent-father] has not established paternity to the child and is not entitled to possession of or access to the child." Thus [respondent-father] was not considered as a placement option at the time of removal.
 

 Based upon this description of the action by the Texas court, it appears that the 29 January 2014 Texas order constitutes an "initial determination" under the UCCJEA.
 
 See
 
 N.C. Gen.Stat. § 50A-102(8) (2013) (defining "initial determination" as "the first child-custody determination concerning a particular child").
 

 DSS and the GAL argue that we must dismiss this appeal because respondent-mother failed to include this Texas order in the record on appeal. We agree that the order should have been included in the record on appeal, just as it should have been noted on the Affidavit as to Status of Minor Child which DSS should have attached to the petition as discussed above. For many issues on appeal, the failure to include this type of information in the record would result in waiver of an argument based upon the missing information, at the very least. But in this case, we are addressing a jurisdictional defect, and under both state and federal law, specifically the UCCJEA and the PKPA, the courts of this
 
 *262
 
 state have an affirmative duty to recognize and enforce a valid child-custody determination made by a court of another state. N.C. Gen.Stat. § 50A-303(a) provides:
 

 A court of this State shall recognize and enforce a child-custody determination of a court of another state if the latter court exercised jurisdiction in substantial conformity with this Article or the determination was made under factual circumstances meeting the jurisdictional standards of this Article, and the determination has not been modified in accordance with this Article.
 

 Id.
 

 § 50A-303(a) (2013). Similarly, 28 U.S.C.A. § 1738A(a) provides:
 

 The appropriate authorities of every State shall enforce according to its terms, and shall not modify except as provided in subsections (f), (g), and (h) of this section, any custody determination or visitation determination made consistently with the provisions of this section by a court of another State.
 

 28 U.S.C.A. § 1738A(a) (2006). "When a prior custody order exists, a court cannot ignore the provisions of the UCCJEA and the Parental Kidnapping Prevention Act."
 
 H.L.A.D.,
 

 184 N.C.App. at 385
 
 ,
 
 646 S.E.2d at 429
 
 (brackets omitted).
 

 In addition, our Court has long recognized the duty of the trial court to make an inquiry regarding jurisdiction: "Whenever
 
 *235
 
 one of our district courts holds a custody proceeding in which one contestant or the children appear to reside in another state, the court must initially determine whether it has jurisdiction over the action."
 
 Davis v. Davis,
 

 53 N.C.App. 531
 
 , 535,
 
 281 S.E.2d 411
 
 , 413 (1981) (footnotes omitted). And despite the lack of complete information in our record, based upon the orders and reports of record, we know that there was an initial determination of custody by Texas, that the respondent-mother provided this order to DSS, and that the trial court was aware of the Texas order. Accordingly, we must examine whether the trial court properly exercised subject matter jurisdiction under the UCCJEA.
 

 ii. Modification Jurisdiction under N.C. Gen.Stat. § 50A-203
 

 Since the Texas court's entry of an initial child-custody determination as to James, "any change to that [Texas] order qualifies as a modification under the UCCJEA."
 
 See
 

 In re N.R.M., T.F.M.,
 

 165 N.C.App. 294
 
 , 299,
 
 598 S.E.2d 147
 
 , 150 (2004) ; N.C. Gen.Stat. § 50A-102(11). The
 
 *263
 
 trial court did not make any findings of fact specifically addressing its subject matter jurisdiction under the UCCJEA. The UCCJEA does not specifically require these findings, although it would be a better practice to make them.
 
 See
 

 In re E.X.J. & A.J.J.,
 

 191 N.C.App. 34
 
 , 40,
 
 662 S.E.2d 24
 
 , 27-28 (2008),
 
 aff'd per curiam,
 

 363 N.C. 9
 
 ,
 
 672 S.E.2d 19
 
 (2009). Accordingly, we must examine if "certain circumstances" exist to support subject matter jurisdiction under the UCCJEA, even if there are no specific findings to that effect.
 
 See
 

 id.,
 

 662 S.E.2d at 27-28
 
 .
 

 The jurisdictional requirements for a modification under the UCCJEA are as follows:
 

 Except as otherwise provided in G.S. 50A-204,
 
 a court of this State may not modify a child-custody determination made by a court of another state unless a court of this State has jurisdiction to make an initial determination under G.S. 50A-201(a)(1) or G.S. 50A-201(a)(2) and:
 

 (1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of this State would be a more convenient forum under G.S. 50A-207 ; or
 

 (2) A court of this State or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.
 

 N.C. Gen.Stat. § 50A-203 (2013) (emphasis added). Section 50A-203 thus allows a North Carolina court to modify another state's initial child-custody determination only when
 

 two requirements are satisfied: (1) the North Carolina court has jurisdiction to make an initial determination under G.S. 50A-201(a)(1) or G.S. 50A-201(a)(2) ; and (2)(a) a court of the issuing state determines either that it no longer has exclusive, continuing jurisdiction under UCCJEA § 202 or that the North Carolina court would be a more convenient forum under UCCJEA § 207 ; or (b) a North Carolina court or a court of the issuing state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the issuing state.
 

 K.U.-S.G., D.L.L.G., & P.T.D.G.,
 

 208 N.C.App. at 133
 
 ,
 
 702 S.E.2d at 106
 
 (quotation marks and brackets omitted).
 

 *264
 
 a. Initial Jurisdiction under N.C. Gen.Stat. § 50A-201(a)(1)
 

 A North Carolina court has jurisdiction to make an initial determination under N.C. Gen.Stat. § 50A-201(a)(1) if North Carolina was
 

 the home state of the child on the date of the commencement of the proceeding, or
 
 was the home state of the child within six months before the commencement of the proceeding,
 
 and the child is absent from this State but a parent or person acting as a parent continues to live in this State[.]
 

 N.C. Gen.Stat. § 50A-201(a)(1) (2013) (emphasis added). A child's "home state" is
 

 the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately
 
 *236
 
 before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned. A period of temporary absence of any of the mentioned persons is part of the period.
 

 Id.
 

 § 50A-102(7). N.C. Gen.Stat. § 50A-102(5) defines "commencement" for UCCJEA purposes as "the filing of the first pleading in a proceeding."
 

 Id.
 

 § 50A-102(5).
 

 We review the history of James and his parents' residences in this case. In April 2013, James was born in North Carolina. The record suggests and no party disputes that from April 2013 to late November 2013, James and respondent-mother lived in North Carolina. On 22 November 2013, respondent-mother took James with her to Texas. On or about 20 February 2014, respondent-mother and James returned to North Carolina. On 7 March 2014, DSS filed the juvenile petition and obtained nonsecure custody of James and placed him with his maternal grandparents, who live in North Carolina. Respondent-father, who was confirmed to be James's father in April 2014, resides in North Carolina. In its 23 February 2015 permanency planning order, the trial court found that "[s]ince the inception of this case, Respondent mother has resided in Texas but has been back and forth between Texas and North Carolina."
 

 Before 22 November 2013, North Carolina was James's home state.
 
 See
 

 id.
 

 § 50A-102(7). This date falls "within six months before the commencement of the proceeding" on 7 March 2014.
 
 See
 
 id.
 

 § 50A-201(a)(1).
 

 *265
 
 At all relevant times, respondent-father has lived in North Carolina. Accordingly, the trial court had jurisdiction to make an initial determination under N.C. Gen.Stat. § 50A-201(a)(1).
 
 See
 
 id.
 

 b. Jurisdictional Requirement of N.C. Gen.Stat. § 50A-203(2)
 

 The second jurisdictional requirement for modification of an initial child-custody determination under the UCCJEA is the following:
 

 (1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of this State would be a more convenient forum under G.S. 50A-207 ; or
 

 (2) A court of this State or a court of the other state determines that the child, the child's parents, and any person acting as a parent do not presently reside in the other state.
 

 Id.
 

 § 50A-203. The determination under subsection (1) above is one that the Texas court would have to make. "[T]he original decree State is the sole determinant of whether jurisdiction continues. A party seeking to modify a custody determination must obtain an order from the original decree State stating that it no longer has jurisdiction."
 
 N.R.M., T.F.M.,
 

 165 N.C.App. at 300
 
 ,
 
 598 S.E.2d at 151
 
 (quoting N.C. Gen.Stat. § 50A-202 official comment (2003)). Nothing in the record suggests that a Texas court determined that "it no longer has exclusive, continuing jurisdiction under G.S. 50A-202 or that a court of [North Carolina] would be a more convenient forum under G.S. 50A-207 [,]" so we must address whether subsection (2) is satisfied. See N.C. Gen.Stat. § 50A-203.
 

 In its 23 February 2015 permanency planning order, the trial court found: "
 
 Since the inception of this case, Respondent mother has resided in Texas
 
 but has been back and forth between Texas and North Carolina. She reports that she lives with her ex-husband in Texas." (Emphasis added.) Respondent-mother testified at the permanency planning hearing on 8 January 2015 that she had been living in Converse, Texas with her ex-husband "[f]or a little over a year." Because the trial court found that respondent-mother resided in Texas, we hold that subsection (2) was not satisfied and thus the trial court lacked modification jurisdiction under N.C. Gen.Stat. § 50A-203. But this conclusion does not end our inquiry since N.C. Gen.Stat. § 50A-203 begins with the phrase: "Except as otherwise provided in G.S. 50A-204 [.]"
 

 Id.
 

 *266
 
 iii. Temporary Emergency Jurisdiction under N.C. Gen.Stat. § 50A-204
 

 A court may exercise temporary emergency jurisdiction "if the child is present
 
 *237
 
 in this State and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse."
 

 Id.
 

 § 50A-204(a) (2013). In the juvenile petition, DSS alleged that respondent-father had been recently charged with assaulting respondent-mother and that he "was about to hit [James but] Respondent mother [had] intervened." In the 7 March 2014 order for nonsecure custody, the trial court checked a box to find that: "[T]he juvenile is exposed to a substantial risk of physical injury or sexual abuse because the parent, guardian, custodian, or caretaker has created conditions likely to cause injury or abuse or has failed to provide, or is unable to provide, adequate supervision or protection." In
 
 In re E.X.J. & A.J.J.
 
 and
 
 In re N.T.U.,
 
 this Court held that a trial court had temporary emergency jurisdiction to grant nonsecure custody to DSS under similar factual circumstances.
 
 E.X.J. & A.J.J.,
 

 191 N.C.App. at 40
 
 ,
 
 662 S.E.2d at
 
 27 ;
 
 In re N.T.U.,
 
 --- N.C.App. ----, ----,
 
 760 S.E.2d 49
 
 , 54,
 
 disc. review denied,
 
 - -- N.C. ----,
 
 763 S.E.2d 517
 
 (2014). We hold that the trial court had temporary emergency jurisdiction to enter the 7 March 2014 order for nonsecure custody.
 
 See
 

 E.X.J. & A.J.J.,
 

 191 N.C.App. at 40
 
 ,
 
 662 S.E.2d at
 
 27 ;
 
 N.T.U.,
 
 --- N.C.App. at ----,
 
 760 S.E.2d at
 
 54 ; N.C. Gen.Stat. § 50A-204(a).
 

 But as best we can tell from the record before us, in the 19 June 2014 adjudication and disposition order, the 2 September 2014 custody review order, and the 23 February 2015 permanency planning order, the trial court did not exercise temporary emergency jurisdiction in accordance with N.C. Gen.Stat. § 50A-204, because in none of those orders did it "specify ... a period that the court considers adequate to allow [DSS] to obtain an order" from the Texas court.
 
 See
 
 N.C. Gen.Stat. § 50A-204(c). Nor did the trial court "immediately communicate" with the Texas court.
 
 See
 

 id.
 

 § 50A-204(d) ;
 
 In re J.W.S.,
 

 194 N.C.App. 439
 
 , 451-53,
 
 669 S.E.2d 850
 
 , 857-58 (2008) (holding that "while the trial court had temporary jurisdiction to enter the nonsecure custody orders, the trial court did not have jurisdiction, exclusive or temporary, to enter the juvenile adjudication order[,]" because "the record [was] devoid of evidence that the trial court ever communicated with the New York court to determine if the New York court wished to exercise jurisdiction[.]"). We also note that the trial court did not purport to exercise temporary emergency jurisdiction; rather, in all three orders, it merely
 
 *267
 
 stated the bare conclusion: "[The] Court has jurisdiction, both personal and subject matter, and all parties have been properly served and are properly before the Court."
 

 We recognize that in
 
 E.X.J. & A.J.J.
 
 and
 
 N.T.U.,
 
 this Court held that the trial court had subject matter jurisdiction to enter subsequent orders despite the fact that it initially only had temporary emergency jurisdiction, because North Carolina eventually acquired home state status.
 
 E.X.J. & A.J.J.,
 

 191 N.C.App. at 44
 
 ,
 
 662 S.E.2d at
 
 29-30 ;
 
 N.T.U.,
 
 --- N.C.App. at ----,
 
 760 S.E.2d at 55
 
 . But we distinguish those cases, because in those cases, a court of another state never entered a child-custody order.
 
 See
 

 E.X.J. & A.J.J.,
 

 191 N.C.App. at 43-44
 
 ,
 
 662 S.E.2d at
 
 29-30 ;
 
 N.
 

 T.U.,
 
 ---N.C.App. at ----,
 
 760 S.E.2d at 55
 
 . In summary, we hold that the trial court properly exercised temporary emergency jurisdiction in the 7 March 2014 order for nonsecure custody but did not have temporary emergency jurisdiction to enter the 19 June 2014 adjudication and disposition order, the 2 September 2014 custody review order, or the 23 February 2015 permanency planning order.
 

 iv. Texas Court's Jurisdiction
 

 The Texas court also may have exercised temporary emergency jurisdiction. Unfortunately, the record does not include the Texas order, so we must vacate the 19 June 2014 adjudication and disposition order, the 2 September 2014 custody review order, and the 23 February 2015 permanency planning order and remand this case to the trial court to examine the Texas order, communicate with the Texas court if necessary, and determine whether the Texas court was (1) exercising exclusive, continuing jurisdiction; (2) exercising temporary emergency jurisdiction; or (3)
 

 *238
 
 not exercising jurisdiction in substantial conformity with the UCCJEA. We note that in
 
 Davis,
 
 this Court addressed on its own the issue of whether a California court was exercising jurisdiction in substantial conformity with the Uniform Child Custody Jurisdiction Act ("UCCJEA"), the UCCJEA's predecessor, but we distinguish that case because the issue of temporary emergency jurisdiction was not at issue there.
 
 See
 

 Davis,
 

 53 N.C.App. at 542
 
 ,
 
 281 S.E.2d at 417
 
 . In addition, as best we can tell from the opinion, the California order was available for this Court's review in
 
 Davis.
 
 Here, we do not have the Texas order before us and thus cannot determine on appeal whether the Texas court exercised jurisdiction in substantial conformity with the UCCJEA.
 

 If the Texas court exercised exclusive, continuing jurisdiction, we direct the trial court to communicate with the Texas court under N.C. Gen.Stat. § 50A-110 (2013) to request the Texas court to determine
 
 *268
 
 (1) whether it no longer has exclusive, continuing jurisdiction; and (2) whether a North Carolina court would be a more convenient forum.
 
 See
 
 id.
 

 § 50A-203(1). If the Texas court exercised temporary emergency jurisdiction, we direct the trial court to immediately communicate with the Texas court under N.C. Gen.Stat. § 50A-110 to "resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order."
 
 See
 
 id.
 

 § 50A-204(d). If the trial court should determine that the Texas court was not exercising jurisdiction "in substantial conformity" with the UCCJEA, the trial court has no duty to recognize or enforce the Texas order and may exercise initial child-custody jurisdiction under N.C. Gen.Stat. § 50A-201(a)(1).
 
 See
 
 id.
 

 § 50A-303(a).
 

 Although we must remand the case for a proper determination of the trial court's jurisdiction under the UCCJEA, "we proceed to address [respondent-mother's] remaining arguments on appeal in the interests of expediting review."
 
 In re E.G.M.,
 

 230 N.C.App. 196
 
 , 204,
 
 750 S.E.2d 857
 
 , 863 (2013) (quotation marks omitted). "In the event that the trial court concludes on remand that it lacks subject matter jurisdiction, then it will be required to dismiss the petition."
 
 Id.
 
 at 204,
 
 750 S.E.2d at 863
 
 (brackets and ellipsis omitted).
 

 III. Permanency Planning Order
 

 Respondent-mother next argues that the trial court (1) erred in relying on written reports that had not been formally tendered and admitted into evidence; (2) failed to verify that James's grandparents understood the legal significance of guardianship and had adequate resources to care for James; (3) erred in concluding that it was impossible to return James to respondent-mother within six months and that further reunification efforts would be futile; (4) erred in concluding that it was in James's best interests for respondent-mother to have minimal visitation and entering a visitation plan that failed to set out the duration of each visitation; and (5) erred in waiving further review hearings.
 

 A. Standard of Review
 

 Our "review of a permanency planning order is limited to whether there is competent evidence in the record to support the findings and whether the findings support the conclusions of law."
 
 In re J.V. & M.V.,
 

 198 N.C.App. 108
 
 , 112,
 
 679 S.E.2d 843
 
 , 845 (2009) (brackets omitted). The trial court's findings of fact "are conclusive on appeal when supported by any competent evidence, even if the evidence could sustain contrary findings."
 

 *269
 

 In re L.T.R. & J.M.R.,
 

 181 N.C.App. 376
 
 , 381,
 
 639 S.E.2d 122
 
 , 125 (2007). In choosing an appropriate permanent plan under N.C. Gen.Stat. § 7B-906.1 (2013), the juvenile's best interests are paramount.
 
 See
 

 In re T.K., D.K., T.K. & J.K.,
 

 171 N.C.App. 35
 
 , 39,
 
 613 S.E.2d 739
 
 , 741 (construing predecessor statute N.C. Gen.Stat. § 7B-907 (2003) ),
 
 aff'd per curiam,
 

 360 N.C. 163
 
 ,
 
 622 S.E.2d 494
 
 (2005). "We review a trial court's determination as to the best interest of the child for an abuse of discretion."
 
 In re D.S.A.,
 

 181 N.C.App. 715
 
 , 720,
 
 641 S.E.2d 18
 
 , 22 (2007). "Questions of statutory interpretation are questions of law, which are reviewed
 
 de novo
 
 by an appellate court."
 
 In re P.A.,
 
 ---N.C.App. ----, ----,
 
 772 S.E.2d 240
 
 , 245 (2015).
 

 *239
 
 B. Consideration of Evidence
 

 Respondent-mother contends that the trial court erred in relying on the following written reports, because they were not formally tendered and admitted into evidence during the hearing: (1) the 8 January 2015 DSS report; (2) the 8 January 2015 GAL report; and (3) the 15 December 2014 psychological evaluation report of respondent-mother prepared by Dr. Karin Yoch. Without these reports, respondent-mother contends, most of the findings of fact and five of the conclusions of law in the permanency planning order lack any evidentiary support.
 
 [3]
 

 "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired" and must have "obtain [ed] a ruling upon the party's request, objection, or motion." N.C.R.App. P. 10(a)(1). As noted by DSS and the GAL, respondent-mother offered no objection at the 8 January 2015 hearing to the trial court's consideration of these reports. Accordingly, we conclude that she waived appellate review of this issue under North Carolina Rule of Appellate Procedure 10(a)(1).
 

 We are not persuaded by respondent-mother's suggestion that she had no opportunity to object at the permanency planning hearing, absent a formal tender of the reports into evidence by DSS and the GAL. The hearing transcript reflects that counsel for DSS announced at the beginning of the hearing, "Judge, we have a court report in [this] matter.... So I'm handing to you ... a permanency planning hearing court report and [Dr. Yoch's] psychological evaluation on the mother." The trial court thanked counsel for the documents. After welcoming the GAL, the trial court announced as follows: "Well, here's what I'm going to do. I'm
 
 *270
 
 going to read everything, and then, [counsel for respondent-mother], if you'd like me to hear from your client, she can stand right there and say whatever she would like to." At no time during this exchange, or during the ensuing pause in proceedings while the court reviewed the written reports, did counsel for respondent-mother object to the court's consideration of these reports. At one point, her counsel even asked "to say something about the psychological evaluation" and offered an explanation for the report's statement "that [James] was born positive for barbiturates and [respondent-mother tested] positive for benzodiazepine" at the time of James's birth. As the transcript makes clear, the trial court both received and intended to consider these reports as evidence. Under Rule 10(a)(1), respondent-mother's failure to raise a timely objection at the hearing is a bar to her current argument on appeal.
 
 See
 
 N.C.R.App. P. 10(a)(1).
 

 Further, we find no merit to respondent-mother's objection. As a type of dispositional hearing, a permanency planning hearing "may be informal and the court may consider written reports or other evidence concerning the needs of the juvenile." N.C. Gen.Stat. § 7B-901 (2013) ;
 
 see also
 

 2015-2 N.C. Adv. Legis. Serv. 236
 
 , 241-42, 250 (LexisNexis) (reflecting sections 9 and 18 of chapter 136 of the 2015 N.C. Session Laws, which organized N.C. Gen.Stat. § 7B-901 into subsections and designated the quoted language to subsection (a) for all "actions filed or pending on or after" 1 October 2015); N.C. Gen.Stat. § 7B-906.1(c) (2013). These hearings are not governed by the North Carolina Rules of Evidence.
 
 See
 

 In re M.J.G.,
 

 168 N.C.App. 638
 
 , 648,
 
 608 S.E.2d 813
 
 , 819 (2005). We therefore conclude that the trial court was free to consider the written reports submitted by DSS, the GAL, and Dr. Yoch without a formal proffer and admission of these documents into evidence as exhibits.
 
 See
 

 id.,
 

 608 S.E.2d at 819
 
 .
 

 C. Verification of Guardians
 

 Respondent-mother next claims that the trial court awarded guardianship of James to his maternal grandparents without verifying that they "understand[ ] the legal significance" of guardianship and have "adequate
 
 *240
 
 resources to care appropriately for the juvenile[,]" as required by N.C. Gen.Stat. §§ 7B-600(c), -906.1(j) (2013). We have held that the trial court need not "make any specific findings in order to make the verification" under these statutory provisions.
 
 In re J.E., B.E.,
 

 182 N.C.App. 612
 
 , 616-17,
 
 643 S.E.2d 70
 
 , 73 (construing N.C. Gen.Stat. § 7B-600(c) and predecessor statute N.C. Gen.Stat. § 7B-907(f) (2005) ),
 
 disc. review denied,
 

 361 N.C. 427
 
 ,
 
 648 S.E.2d 504
 
 (2007). But the record must contain competent evidence of the guardians' financial resources and their awareness
 
 *271
 
 of their legal obligations.
 
 See
 

 P.A.,
 
 --- N.C.App. at ----,
 
 772 S.E.2d at 246
 
 (addressing the issue of verification of a guardian's resources);
 
 In re L.M.,
 
 --- N.C.App. ----, ----,
 
 767 S.E.2d 430
 
 , 433 (2014) (holding "there was insufficient evidence that [the child's] foster mother understood and accepted the responsibilities of guardianship"). As this Court recently explained:
 

 It is correct that the trial court need not make detailed findings of evidentiary facts or extensive findings regarding the guardian's situation and resources, nor does the law require any specific form of investigation of the potential guardian.
 
 See
 
 N.C. Gen.Stat. §§ 7B-600(c),-906.1(j). But the statute does require the trial court to make a determination that the guardian has "adequate resources" and some evidence of the guardian's "resources" is necessary as a practical matter, since the trial court cannot make any determination of adequacy without evidence....
 

 ....
 

 The trial court has the responsibility to make an independent determination, based upon facts in the particular case, that the resources available to the potential guardian are in fact "adequate."
 

 P.A.,
 
 --- N.C.App. at ----,
 
 772 S.E.2d at 246-48
 
 (brackets omitted). In
 
 P.A.,
 
 a social worker testified that the potential guardian provided a residence for the child and was able to meet all of the child's medical, dental, and financial needs.
 

 Id.
 

 at ----,
 
 772 S.E.2d at 247
 
 . This Court held that this conclusory testimony was insufficient to show that the potential guardian had adequate resources to care for the child.
 

 Id.
 

 at ----,
 
 772 S.E.2d at 248
 
 .
 

 At the time of the permanency planning hearing, James had been in a successful kinship placement with his maternal grandparents for ten months. The trial court found that the grandparents had met "[a]ll of his well-being needs [,]" and the 8 January 2015 DSS report stated that they had been "meeting [James's] medical needs as well, making sure that he has his yearly well-checkups." The GAL's 8 January 2015 report stated that James had "no current financial or material needs[.]" The grandparents also have custody of James's sister. But this evidence alone is insufficient to support a finding that James's grandparents "have adequate resources" to care for James.
 
 See
 
 N.C. Gen.Stat. §§ 7B-600(c), -906.1(j);
 
 P.A.,
 
 --- N.C.App. at ----,
 
 772 S.E.2d at 247-48
 
 (holding that a similar amount of evidence was insufficient to satisfy
 
 *272
 
 N.C. Gen.Stat. §§ 7B-600(c), -906.1(j)). The trial court also failed to "make an independent determination, based upon facts in the particular case, that the resources available to the potential guardian are in fact adequate."
 
 See
 

 P.A.,
 
 --- N.C.App. at ----,
 
 772 S.E.2d at 248
 
 (quotation marks and brackets omitted).
 

 Similarly, the trial court cannot make a determination that a potential guardian understands the legal significance of a guardianship unless the trial court receives evidence to that effect.
 
 See
 

 L.M.,
 
 --- N.C.App. at ----,
 
 767 S.E.2d at 433
 
 . Here, the trial court failed to verify that the grandparents understood the legal significance of guardianship, because the grandparents did not testify at the permanency planning hearing and neither DSS nor the GAL reported to the court that the grandparents were aware of the legal significance of guardianship.
 
 See
 

 id.,
 

 767 S.E.2d at 433
 
 . Should the trial court reconsider this issue on remand, we direct it to comply with N.C. Gen.Stat. §§ 7B-600(c),-906.1(j).
 
 [4]
 

 See
 

 P.A.,
 
 --- N.C.App. at ----,
 
 772 S.E.2d at 248
 
 .
 

 *241
 
 We also note that the trial court on remand should more clearly address whether respondent-mother is unfit as a parent or if her conduct has been inconsistent with her constitutionally protected status as a parent, should the trial court again consider granting custody or guardianship to a nonparent. In
 
 In re B.G.,
 
 this Court addressed this issue:
 

 [T]o apply the best interest of the child test in a custody dispute between a parent and a nonparent, a trial court must find that the natural parent is unfit or that his or her conduct is inconsistent with a parent's constitutionally protected status.
 

 Here, the trial court concluded that it was in the best interest of Beth to remain with the Edwardses but failed to issue findings to support the application of the best interest analysis-namely that Respondent acted inconsistently with his custodial rights. Although there may be evidence in the record to support a finding that Respondent acted inconsistently with his custodial rights, it is not the duty of this Court to issue findings of fact.
 

 *273
 
 Rather, our review is limited to whether there is competent evidence in the record to support the findings and the findings support the conclusions of law. Accordingly, we must reverse the order awarding custody to the minor child's non-parent relative and remand for reconsideration in light of this opinion.
 

 In re B.G.,
 

 197 N.C.App. 570
 
 , 574-75,
 
 677 S.E.2d 549
 
 , 552-53 (2009) (citations and quotation marks omitted).
 

 D. Reunification
 

 Respondent-mother argues that the trial court's findings of fact do not support its conclusion of law that it is not possible for James to be returned home within the next six months and its conclusion of law that further efforts to reunify James with respondent-mother would be futile and inconsistent with James's health, safety, and need for a safe, permanent home within a reasonable period of time.
 
 [5]
 

 See
 
 N.C. Gen.Stat. § 7B-906.1(d)(3), (e)(1) (2013).
 

 i. Impossibility of Returning Home Within Six Months
 

 N.C. Gen.Stat. § 7B-906.1(e)(1) provides:
 

 At any permanency planning hearing where the juvenile is not placed with a parent, the court shall ... consider the following criteria and make written findings regarding those that are relevant:
 

 (1) Whether it is possible for the juvenile to be placed with a parent within the next six months and, if not, why such placement is not in the juvenile's best interests.
 

 N.C. Gen.Stat. § 7B-906.1(e)(1). The trial court's findings must explain "why [James] could not be returned home immediately or within the next six months, and why it is not in [his] best interests to return home."
 
 In re I.K.,
 

 227 N.C.App. 264
 
 , 275,
 
 742 S.E.2d 588
 
 , 595-96 (2013).
 

 The trial court made the following findings in support of its conclusion of law that it would not be possible to return James to respondent-mother's home within the next six months:
 

 *274
 
 3. It is not possible for the juvenile to be returned home in the immediate future or within the next six (6) months and in support thereof, the court specifically finds:
 

 a. Respondent mother has a history of addiction that dates to her teenage years. She has been in [multiple] treatment programs but has never sustained a significant period of recovery and sobriety.
 

 b. Since the inception of this case, Respondent mother has resided in Texas but has been back and forth between Texas and North Carolina. She reports that she lives with her ex-husband in Texas. They have had a violent relationship
 
 *242
 
 that she reports is no longer violent.
 

 c. Respondent mother has likewise had a violent relationship with Respondent father. From [mid-June] 2014 until [mid-July] 2014, Respondent mother traveled to North Carolina from Texas and while in the state, stayed with Respondent father. During this time, there was serious violence between Respondent parents. Although Respondent mother first denied that she was staying with Respondent father, she ultimately called the Social Worker and asked the Social Worker to pick her up from Respondent father's home as she was afraid of him. The Social Worker removed her from the home and two days later, she returned to Texas.
 

 d. Respondent mother signed a Services Agreement in May 2014. The agreement included that Respondent mother should obtain drug treatment and complete a psychological evaluation.
 

 e. On or about September 29, 2014, Respondent mother entered a seventy (70) day inpatient program in San Antonio, Texas called Alpha House. As of this hearing, Respondent mother reports one hundred and three (103) days of clean time and she reports that she continues to be in an outpatient treatment program.
 

 ....
 

 *275
 
 g. Respondent mother completed a psychological evaluation with Dr. Karin Yoch [in December 2014]. The report has been reviewed by the court in its [ ] entirety and is included in the file of this matter. The evaluation is incorporated herein as findings of fact as though fully set forth and supports the conclusions and orders herein set forth below. According to Dr. Yoch, Respondent mother needs multiple services, including
 
 nine (9) months
 
 of sustained clean time prior to giving consideration to a return of [James] to her care.
 

 ....
 

 5. When [James] was placed with the maternal grandparents, he had been neglected, which Respondent mother now admits. When [James] was first placed with the maternal grandparents, he suffered from developmental delays, likely due to being neglected by Respondent mother. His speech is delayed and he often grunts and points as a form of communication. [James] has gained weight and is walking and running. All of his well-being needs are being met by the maternal grandparents.
 

 6. [James] needs stability, structure, consistency and to be loved and nurtured. It would likely be harmful and detrimental to [James] to remove him from the home of his maternal grandparents.
 

 7. Given Respondent mother's lengthy history of drug addiction and her very recent admission to inpatient and outpatient drug treatment, it is not in [James's] best interest to be returned to the custody and care of Respondent mother. Respondent mother has much work to do before she will be able to parent and she has only just begun to address her addiction and mental health issues.
 

 (Emphasis added.) The trial court found that respondent-mother had not fully resolved her issues of domestic violence, mental health, and substance abuse and needed to continue to make progress in those areas before reunification could occur. We conclude that these findings adequately support the trial court's conclusion of law under N.C. Gen.Stat. § 7B-906.1(e)(1) that returning James to respondent-mother's care within six months would be contrary to his best interests.
 

 *276
 
 ii. Futility of Further Reunification Efforts
 

 Respondent-mother also challenges the trial court's conclusion of law that "[b]ased upon the evidentiary findings listed above, further efforts to reunify or place [James] with Respondent mother clearly would be futile and/or inconsistent with [James's] health, safety, and need for a safe, permanent home within a reasonable period of time." Respondent-mother acknowledges her "very long substance [abuse] history" and "several" prior attempts at sobriety but "asserts that her current efforts at reunification
 
 *243
 
 and compliance with her case plan support continued reunification efforts."
 

 Section 7B-906.1 of the Juvenile Code requires the trial court at each permanency planning hearing to "consider the following criteria and make written findings regarding those that are relevant: ... [w]hether efforts to reunite the juvenile with either parent clearly would be futile or inconsistent with the juvenile's safety and need for a safe, permanent home within a reasonable period of time." N.C. Gen.Stat. § 7B-906.1(d)(3). This determination "is in the nature of a conclusion of law that must be supported by adequate findings of fact."
 
 E.G.M.,
 

 230 N.C.App. at 209
 
 ,
 
 750 S.E.2d at 867
 
 .
 

 The trial court made the following findings, which show that at the time of the 8 January 2015 hearing, respondent-mother had begun to address her domestic violence, mental health, and substance abuse issues:
 

 [3]b.... [Respondent-mother] reports that she lives with her ex-husband in Texas. They have had a violent relationship that she reports is no longer violent.
 

 e. On or about September 29, 2014, Respondent mother entered a seventy (70) day inpatient program in San Antonio, Texas called Alpha House. As of this hearing, Respondent mother reports one hundred and three (103) days of clean time and she reports that she continues to be in an outpatient treatment program.
 

 f. Respondent mother reports that she works at a restaurant approximately thirty (30) hours per week.
 

 In addition, Dr. Yoch's psychological evaluation report, which the trial court incorporated into its findings of fact, included the following recommendation:
 

 Reunification should not be considered until [respondent-mother] has demonstrated a commitment to recovery
 
 *277
 
 and documented sobriety for at least 9 months, particularly given the seriousness and longstanding nature of her addictions. She needs to show an ability to perform in a stable job or jobs over a similar period of time, without being fired or laid off due to relationship or job performance issues. [Respondent-mother] would also need to have the financial resources to support her children and to have stable and safe housing.
 

 (Portions of original in all caps and in bold.) The trial court thus found that it could consider reunification if respondent-mother overcame her substance abuse and secured stable employment and housing in the next nine months. Should the trial court conclude it has subject matter jurisdiction on remand, it should determine whether respondent-mother has continued to make progress in the areas of domestic violence, mental health, and substance abuse and reexamine this issue of reunification in accordance with N.C. Gen.Stat. § 7B-906.1(d)(3).
 

 E. Visitation
 

 Respondent-mother next argues that the trial court's findings of fact do not support its conclusion of law that "[i]t is in [James's] best interest to have minimal visitation with Respondent mother." But Findings of Fact 3, 5, 6, and 7, as quoted and discussed above, demonstrate that respondent-mother had not fully resolved her issues of domestic violence, mental health, and substance abuse. The trial court's findings of fact thus support this conclusion of law.
 

 Respondent next challenges the visitation plan entered by the trial court under N.C. Gen.Stat. § 7B-905.1(c) (2013) on the ground that it fails to specify the duration of her visitation with James. The statute requires "any order providing for visitation [to] specify the minimum frequency
 
 and length
 
 of the visits and whether the visits shall be supervised." N.C. Gen.Stat. § 7B-905.1(c) (emphasis added). The permanency planning order merely provides: "[Respondent-mother] shall have monthly visitation in North Carolina with [James] supervised by the [grandparents] at a location of their choice. [Respondent-mother] shall give sufficient notice to the [grandparents] of her intent to exercise visitation." The order fails to establish the duration of respondent-mother's monthly visitation. Should the trial court reconsider this issue on remand, we direct it to comply with
 
 *244
 
 N.C. Gen.Stat. § 7B-905.1(c).
 
 See
 

 In re T.H.,
 

 232 N.C.App. 16
 
 , 34,
 
 753 S.E.2d 207
 
 , 219 (2014).
 
 *278
 
 F. Waiver of Further Review Hearings
 

 Respondent-mother contends that the trial court erred in waiving subsequent permanency planning hearings under N.C. Gen.Stat. § 7B-906.1(n), because James had not "resided in the placement for a period of at least one year" at the time of the permanency planning hearing.
 
 See
 
 N.C. Gen.Stat. § 7B-906.1(n)(1). Subsection (n) provides that a court may waive further hearings only "if the court finds by clear, cogent and convincing evidence" each of the following:
 

 (1) The juvenile has resided in the placement for a period of at least one year.
 

 (2) The placement is stable and continuation of the placement is in the juvenile's best interests.
 

 (3) Neither the juvenile's best interests nor the rights of any party require that review hearings be held every six months.
 

 (4) All parties are aware that the matter may be brought before the court for review at any time by the filing of a motion for review or on the court's own motion.
 

 (5) The court order has designated the relative or other suitable person as the juvenile's permanent custodian or guardian of the person.
 

 Id.
 

 § 7B-906.1(n). "The trial court must make written findings of fact satisfying each of the enumerated criteria listed in N.C. Gen.Stat. § 7B-906.1(n), and its failure to do so constitutes reversible error."
 
 P.A.,
 
 ---N.C.App. at ----,
 
 772 S.E.2d at 249
 
 .
 

 Here, the trial court failed to make any findings in support of the first, third, and fourth criteria set forth in N.C. Gen.Stat. § 7B-906.1(n). And it would have been impossible for the trial court to make a finding as to the first criterion, because James had not resided with his maternal grandparents for at least one year at the time of the 8 January 2015 hearing or at the time the trial court entered its 23 February 2015 permanency planning order. Should the trial court reconsider this issue, we direct it to comply with N.C. Gen.Stat. § 7B-906.1(n).
 

 IV. Conclusion
 

 We vacate the 19 June 2014 adjudication and disposition order, the 2 September 2014 custody review order, and the 23 February 2015
 
 *279
 
 permanency planning order and remand for further proceedings consistent with this opinion. We also deny the GAL's motion to dismiss.
 

 VACATED AND REMANDED.
 

 Judges CALABRIA and DAVIS concur.
 

 [1]
 

 We use this pseudonym to protect the juvenile's identity.
 

 [2]
 

 We realize that it is not uncommon for documents attached as exhibits to pleadings to be inadvertently omitted when the documents are later being copied, and it is entirely possible that an affidavit was attached to the petition when it was filed. Unfortunately, the information which might have been on the affidavit is crucial to the issue raised in this appeal, but it is not in our record.
 

 [3]
 

 Respondent-mother makes a blanket challenge to Findings of Fact 3(c), 3(g), 3(h), 5-11, and 13-19 and to all five conclusions of law.
 

 [4]
 

 We recognize that the grandparents have custody of James's sister, so it is possible that the trial court was aware of the grandparents' resources and understanding of their responsibilities from its consideration of her case. "But we must base our analysis only on the evidence which appears in the record on appeal in this case."
 
 P.A.,
 
 ---N.C.App. at ---- n. 3,
 
 772 S.E.2d at
 
 248 n. 3.
 

 [5]
 

 The trial court mislabeled these conclusions of law as findings of fact.
 
 See
 

 E.G.M.,
 

 230 N.C.App. at 209
 
 ,
 
 750 S.E.2d at 867
 
 (holding that a trial court's finding that grounds exist to cease reunification efforts was a conclusion of law). But the mislabeling of a conclusion of law as a finding of fact has no impact on its efficacy.
 
 In re R.A.H.,
 

 182 N.C.App. 52
 
 , 60,
 
 641 S.E.2d 404
 
 , 409 (2007).